[Cite as *Warkoczeski v. Speedway*, 2010-Ohio-2518.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## AUGLAIZE COUNTY


BETTY J. WARKOCZESKI,

    PLAINTIFF-APPELLANT,              CASE NO.  2-09-26

    v.

SPEEDWAY SUPERAMERICA, LLC,        O P I N I O N

    DEFENDANT-APPELLEE.


Appeal from Auglaize County Common Pleas Court
Trial Court No. 2008 CV 0323

**Judgment Affirmed**

Date of Decision:    June 7, 2010


APPEARANCES:

    *Joseph W. O'Neil and Jennifer N. Brown*  for Appellant

    *Anthony J. Calamunci and Amy L. Butler*  for Appellee

Case No. 2-09-26

**SHAW, J.**

{¶1} Plaintiff-appellant Betty J. Warkoczeski ("Betty") appeals the September 24, 2009 Judgment Entry of the Auglaize County Court of Common Pleas rendered on the September 4, 2009 jury verdict in favor of defendant-appellee Speedway ("Speedway").

{¶2} The case arises out of the following set of facts. On October 14, 2007, Betty was travelling with her daughter and son-in-law, Julie and Marv Scott, on Interstate I-75. The three were on their way home from visiting with Betty's granddaughter, Meredith Scott, in Dayton. At approximately 11:08 a.m., they made a stop at the Speedway[1] in Cridersville, Ohio. Marv parked at one of the gas pumps and exited the car to use the facilities in the Speedway convenience store. A few minutes later, Julie and Betty followed behind also intending to use the facilities and purchase some refreshments for the remainder of the trip.

{¶3} As they approached the entrance to the convenience store from the parked car, Julie walked on Betty's right side while holding her right hand. Located in front of the entrance to the store, was a sidewalk with a three inch curb. This sidewalk extended along the entire front side of the building. To the left of the front entrance was a slight ramp located at the end of the sidewalk which created easy access to the store for wheelchairs and deliveries. Located to the

---

[1] Speedway is in the business of selling fuel, food, drinks and other items to the general public.

right of the ramp, was a drain which diverted the water runoff from the gutters into the main parking lot. The drain was covered by a metal plate designed to sit flush with the surrounding sidewalk (collectively referred to by the parties as "the grate"). It is undisputed by the parties that the metal grate covering the drain was deteriorated and displayed several areas of rust and corrosion.

{¶4} As they approached the curb at the front of the store, Julie released Betty's right hand and moved ahead to open the store's door for Betty. Betty claims that as she advanced toward to the door, she stepped up onto the grate which unexpectedly moved from under her feet, and caused her to fall. Betty stated that she fell on the concrete and landed on the left side of her body. As a result of the fall, Betty broke her wrist and suffered injuries to her left hip and leg.

{¶5} Betty was taken by an ambulance to a local hospital shortly thereafter. There were no eyewitnesses to the cause of Betty's fall. Julie testified that she did not observe the origin of Betty's fall, and only caught sight of Betty in mid-air as she descended onto the cement. Moreover, the location of Betty's fall occurred outside of the line of sight of Speedway's surveillance cameras. As a result, the only evidence of what occurred is Betty's account of her fall.

{¶6} On September 16, 2008, Betty filed this lawsuit against Speedway alleging premises liability negligence. Specifically, Betty alleged that Speedway owed her a duty as a business invitee; that Speedway breached this duty by

permitting a dangerous and hazardous condition to exist—i.e. the grate; that Speedway knew or should have known that the condition of the grate would cause injury to Betty and other business invitees; that Speedway failed to warn Betty and other business invitees of the dangerous and hazardous condition of the grate and; that these negligent acts were the proximate cause of Betty's injuries. On October 16, 2008, Speedway filed its answer denying *inter alia* any negligence on its part, and stating that it had no duty to warn Betty of an open and obvious hazard.

{¶7} Various pleadings and pre-trial motions were filed. Several witnesses, including Betty, were deposed. In her deposition, Betty stated how she remembered the incident occurred. Specifically, Betty testified that *she first stepped with her right foot* up onto the concrete sidewalk on top of the curb. Then she *next stepped with her left foot directly onto the grate*. Betty testified that she immediately fell to her left upon taking her second step with her left foot. However, Betty also testified that the fall happened so fast and she could not recall feeling the grate move or seeing the grate move when she stepped on it. Further, when asked by Speedway's counsel if she saw the grate before stepping on to it, Betty replied, "I assume I did, yes." (Depo. p.53).

{¶8} Approximately three weeks after she was deposed, Betty submitted an "errata sheet" to her deposition. In the errata sheet, Betty claimed she was able to describe the sequence of her steps immediately prior to her fall with greater

clarity. Betty now stated that as she approached the curb at the front of the store, she actually made her *first step with her left foot onto the grate* and then subsequently fell. Betty further described her fall "like there was no sidewalk where there should have been sidewalk." (Errata Sheet p.1).

{¶9} In an attempt to understand the mechanics of Betty's fall, each party hired an expert to conduct an analysis of the scene and to reconstruct the conditions of Betty's fall. Betty's expert, Michael Hayslip, a civil engineer, attorney, and a Certified Safety Professional, conducted his investigation of the scene on March 16, 2009. And Speedway's expert, Larry Goodwin, a mechanical engineer experienced in accident reconstruction and analyzing structural failures conducted his investigation of the scene on May 8, 2009. Because there were no eyewitnesses to Betty's fall, both experts relied on Betty's account of her fall and their respective investigations of the scene to determine whether the grate was the proximate cause of her injuries.

{¶10} On August 4, 2009 Betty filed a motion to exclude the testimony of Speedway's expert, Larry Goodwin. On August 14, 2009, Speedway filed several motions including a motion to exclude the testimony of Betty's expert, Michael Hayslip. Speedway also filed a motion in limine to preclude the introduction of any evidence of subsequent remedial measures.

{¶11} On August 21, 2009, the trial court held an evidentiary hearing on the pending matters wherein counsel for both parties argued the merits of their motions. On September 1, 2009, the trial court ruled on the motions via its Judgment Entry. The court granted Speedway's motion to preclude any evidence of subsequent remedial measures and denied both parties' motions to exclude the other's expert testimony. The case proceeded to trial on the same day.

{¶12} In support of her case, Betty presented the testimony of several witnesses including that of Julie, Marv, multiple Speedway employees familiar with the condition of the grate at the time and/or prior to the incident, and expert Hayslip. Betty provided similar testimony at trial to that given in her deposition. Betty maintained that her second account submitted in the errata sheet—that she made her first step with her left foot onto the grate—was the correct sequence of her footing. Betty also testified that she did not look down to see her foot step onto the grate and that she did not have any memory as to how she fell. Nevertheless, she maintained throughout her testimony that the grate was the cause of her fall.

{¶13} Betty's expert, Hayslip, also testified and concluded that the grate was unsafe and had the ability to move unexpectedly when stepped upon. Moreover, as a safety expert, much of Hayslip's testimony focused on his assessment that Speedway breached its duty to Betty and other business invitees

by failing to use ordinary care and failing to give adequate warning of the grate's dangerous condition. In assessing whether the grate was the proximate cause of Betty's injuries, Hayslip opined that he believed Betty's account of how she fell in her deposition was accurate and "plausible" given the testimony of other Speedway employees who said they experienced the grate move when they walked across it.

{¶14} As the primary portion of its defense, Speedway presented the testimony of expert Goodwin. Goodwin's testimony focused on proximate cause. Goodwin testified that based on his analysis of the scene, he concluded that it was improbable that Betty fell the way she described in *both* her deposition and errata sheet. After reviewing the surveillance video recorded at the time of the incident and his analysis at the scene, Goodwin concluded that Betty was positioned further to the left of the grate than she stated in her deposition. Goodwin concluded that Betty's location immediately before she fell was in a zone that encompassed an area between the top of the ramp and the grate.

{¶15} Based on this conclusion, Goodwin further identified two scenarios which he concluded were more consistent with both of Betty's accounts. Goodwin found Betty's first description of her fall—that she first stepped with her right foot onto the concrete and then stepped up with her left foot onto the grate— was improbable given where Goodwin concluded Betty to be positioned. Instead,

Goodwin stated that Betty's original description was more consistent with Betty stepping with her right foot onto the grate. However, Goodwin found this scenario was unlikely because it would have resulted in Betty falling to her right and her injuries were clearly consistent with falling to her left.

{¶16} Goodwin concluded a second scenario was more likely. Based on his findings which placed Betty to the left of the grate, Goodwin concluded that Betty's account that she made her first step with her left foot was consistent with her stepping up onto the ramp in the sidewalk which was located directly to the left of the grate. Further, Goodwin testified that Betty's recollection that she felt nothing at the moment of her fall was more consistent with the sensation a person would experience as she stepped up onto an elevated surface and expected that surface to be higher than it actually was thus causing a loss of balance. As a result, Goodwin testified to a reasonable degree of scientific certainty that Betty's fall did not occur as she described in either her deposition or errata sheet due to his opinion as to her placement relative to the grate at the time of her fall.

{¶17} At the close of all the evidence, the trial court read to the jury the instructions, interrogatories and the verdict forms. The jury then retired to deliberate and returned with a verdict later that day. The jury was given a number of interrogatories, but only made a decision as to the first one. Interrogatory No.1 asked the jury, in its entirety, "[w]as Defendant Speedway SuperaAmerica, LLC,

negligent?" In response, the jury circled, "NO" and seven out of the eight jurors signed the interrogatory. The interrogatory then instructed the jury to do the following, "[i]f your answer to this Interrogatory is "NO," please stop and enter judgment in favor of the Defendant." The same seven jurors then signed the verdict form finding in favor of Speedway. Betty now appeals to this Court, asserting four assignments of error.

### ASSIGNMENT OF ERROR NO. I
**THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY EXCLUDING EVIDENCE BASED UPON [SPEEDWAY'S] CLAIM OF SUBSEQUENT REMEDIAL MEASURES**

### ASSIGNMENT OF ERROR NO. II
**THE TRIAL COURT COMMITTED PREJUDICIAL ERROR WHEN THE COURT ALLOWED LARRY GOODWIN TO TESTIFY, BECAUSE HIS TESTIMONY LACKED BOTH FACTUAL AND A SCIENTIFIC BASIS TO TESTIFY, RENDERING GOODWIN'S TESTIMONY UNRELIABLE AND NOT HELPFUL TO THE JURY, AND GOODWIN ADDED ADDITIONAL OPINIONS AT TRIAL**

### ASSIGNMENT OF ERROR NO. III
**THE TRIAL COURT COMMITTED PREJUDICIAL ERROR WHEN THE COURT INSTRUCTED THE JURY AS TO OPEN AND OBVIOUS DANGER; PLACED THE BURDEN UPON [BETTY] TO DISPROVE THE HAZARD WAS OPEN AND OBVIOUS; AND EXCLUDED A JURY INSTRUCTION AS TO CONSTRUCTIVE NOTICE OF THE HAZARDOUS GRATE**

### ASSIGNMENT OF ERROR NO. IV
**THE TRIAL COURT COMMITTED PREJUDICIAL ERROR WHEN THE TRIAL COURT ALLOWED SPEEDWAY TO INTRODUCE EVIDENCE OF BETTY'S PROPENSITY TO FALL**

{¶18} Initially, we note that for ease of discussion, we elect to address Betty's assignments of error out of order.

*The Second Assignment of Error*

{¶19} In her second assignment of error, Betty argues that the trial court erred in allowing Speedway's witness, Larry Goodwin, to testify as an expert. As a basis for this assertion, Betty maintains that Goodwin's testimony lacked both a scientific and factual basis rendering his testimony unreliable and therefore, not helpful to the jury.

{¶20} Trial courts have broad discretion in determining the admissibility or exclusion of expert testimony. *Terry v. Caputo*, 115 Ohio St.3d 351, 356, 2007-Ohio-5023, ¶16, 875 N.E.2d 72. Therefore, an appellate court reviews a trial court's decision on the admissibility of such evidence for an abuse of discretion. *Id.* "Abuse of discretion suggests unreasonableness, arbitrariness, or unconscionability. Without those elements, it is not the role of this court to substitute its judgment for that of the trial court." *Valentine v. Conrad*, 110 Ohio St.3d 42, 43, 2006-Ohio-3561, ¶9, 850 N.E.2d 683 citing *Calderon v. Sharkey* (1982), 70 Ohio St.2d 218, 222, 436 N.E.2d 1008.

{¶21} The trial court plays the role of a gatekeeper when determining the admissibility of an expert's testimony. *Daubert v. Merrill Pharmaceuticals, Inc.*, (1993) 509 U.S. 594, 597. Thus, an expert's testimony must meet the criteria of

Evid.R. 702 which provides that a witness may testify as an expert if all of the following apply:

> **(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;**
>
> **(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;**
>
> **(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:**
>
> **(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;**
>
> **(2) The design of the procedure, test, or experiment reliably implements the theory;**
>
> **(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.**

Evid.R. 702; see also *State v. Rowe*, 3rd Dist. Nos. 14-05-31, 14-05-46, 2006-Ohio-1883, citing *State v. Hartman* (2001), 93 Ohio St.3d 274, 283-84, 754 N.E.2d 1150. Further, as an additional consideration of admissibility, the expert's testimony must assist the trier of fact in determining a fact issue or understanding the evidence. *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 611, 1998-Ohio-187, 687 N.E.2d 735.

{¶22} In the present case, the parties do not dispute that Goodwin is a qualified expert who testified about a subject beyond the knowledge of lay persons.[2] See Evid.R. 702(A) and (B). However, Betty contends that Goodwin's opinion is not reliable and therefore does not satisfy Evid.R. 702(C). In determining whether Goodwin's opinion is reliable, our inquiry focuses on whether the principles and methods Goodwin employed to reach his opinion are reliable, and not on whether his conclusions are correct. See *Miller*, 80 Ohio St.3d at 613.

{¶23} Speedway asked Goodwin to evaluate the site conditions and reconstruct the incident causing Betty's injuries. As the primary focus of his investigation, Goodwin analyzed the scene according to Betty's account of her fall in both her deposition and errata sheet. Goodwin also used the video surveillance from the date of incident which displayed the trajectory that Betty and Julie took from the parked car at the gas pumps to the front of the convenience store. However, as noted above, the location of the grate and the area where Betty fell were outside of the line of sight of Speedway's surveillance cameras.

{¶24} In order to recreate the part of Betty's path not captured by Speedway's cameras, Goodwin took measurements of the grate and the

---

[2] Goodwin is a professional engineer who has conducted accident reconstructions for the past fifteen years. Goodwin holds professional registration as an engineer in sixteen states in addition to Ohio and has testified as an expert in those states. Additionally, Goodwin has participated as an expert in nearly 150 cases similar to the case sub judice.

surrounding area. Goodwin used the video surveillance from the incident as a starting point. He then re-created the scene from those camera angles so that he could assess Betty's entire path. Goodwin then compared the camera angles from the surveillance camera on the date of Betty's fall and the ones he used on the date of his investigation. Based on his reconstruction of Betty's entire path, Goodwin concluded that Betty's position at the time of her fall was located somewhere between two end points—the leftmost point being the top of the ramp and the rightmost point being the right edge of the grate. Accordingly, Goodwin concluded to a reasonable degree of scientific certainty that it was highly improbable that Betty stepped on the grate with her left foot, as she had described in her testimony.

{¶25} Betty raises two issues with Goodwin's investigation to contend that principles and methods he used are unreliable and should have been excluded.

{¶26} First, Betty maintains that Goodwin's use of camera angles to recreate the missing link of Betty's trajectory to the store is flawed. Betty argues that Goodwin's methodology lacked a foundation because Goodwin failed to verify that the camera angles on the date of his investigation were similar to the ones on the date of Betty's fall.

{¶27} However, at trial Goodwin testified to a reasonable degree of scientific certainty that the camera angles on the date of his investigation were

similar to the camera angles from the surveillance video recorded on the date of Betty's fall. Moreover, Hayslip—Betty's own expert—stated numerous times throughout his testimony that in formulating his own conclusions he relied, in part, on the measurements and conclusions contained in Goodwin's report. Further, Hayslip specifically stated that he relied on the same camera angles used in Goodwin's investigation to conclude that Betty stepped in the zone that included the grate. Hayslip further stated that he shared the same opinion as Goodwin regarding Betty's position relative to the grate immediately prior to her fall. Indeed, the only point on which the two experts appear to diverge in their respective testimony regarding the proximate cause of Betty's injuries, is with regard to their conclusion as to whether Betty's fall was caused by her stepping up directly onto the grate as she testified.

{¶28} Second, Betty also maintains that Goodwin's opinion is unreliable because his investigation did not include an extensive analysis focusing on the stability of the grate. Specifically, Betty contends that Goodwin's failure to manipulate the grate and to perform load calculations to assess how much weight the grate can withhold before becoming unstable rendered his opinion unreliable and unhelpful to the jury. However, Betty does not provide any authority that this type of analysis is required in order to satisfy the reliability requirement under Evid.R. 702(C) under these circumstances. Moreover, Betty's counsel addressed

this specific issue at trial when he cross-examined Goodwin and inquired why Goodwin did not use this type of analysis in his investigation. In response to this questioning, Goodwin simply stated that he did not think that such an analysis was relevant to the reconstruction of this incident.

{¶29} Finally, Betty complains that Goodwin made additional conclusions in his testimony at trial that were not included in his previous deposition. However, after reviewing Goodwin's investigation report and his subsequent deposition, we find that the conclusions Goodwin gave at trial were consistent with those given in his deposition. As such, we find Betty's contention on this point is without merit.

{¶30} Based on the record before us, we cannot find that the trial court erred in concluding that principles and methods Goodwin employed to reach his opinion were reliable. Moreover, we are reminded that "the jury, as the trier of fact, is vested with the power to judge the credibility of witnesses and to determine the weight to be afforded to the evidence presented." *Croft v. State Farm Mutual Auto. Ins. Co.,* 3d Dist. No. 1-01-72, 2002-Ohio-113, citing *Swan v. Skeen* (1974), 40 Ohio App.2d 307, 308-309, 319 N.E.2d 221. As such, we find no error in the trial court's determination on the admissibility of Goodwin expert testimony. Betty's second assignment of error is therefore overruled.

### *The First Assignment of Error*

**{¶31}** In her first assignment of error, Betty contends that the trial court committed reversible error when it granted Speedway's motion to preclude any evidence of subsequent remedial measures. Specifically, Betty argues that the rule barring this type of evidence is inapplicable to the present case because Speedway did not take any subsequent remedial measures until 21 months after Betty's fall. Alternatively, Betty argues that the proffered evidence does not violate the rule because it is offered for other purposes which do not require exclusion.

**{¶32}** A trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence. *Rigby v. Lake Cty.* (1991), 58 Ohio St.3d 269, 271, 569 N.E.2d 1056. Therefore, an appellate court which reviews the trial court's admission or exclusion of evidence must limit its review to whether the lower court abused its discretion. *Id.* An "abuse of discretion" implies more than an error of law and judgment, but that the trial court's attitude is unreasonable, arbitrary or unconscionable. *Holman v. Licking Cty* (1995), 107 Ohio App.3d 106, 112, 667 N.E.2d 1239.

**{¶33}** Rule 407 of the Ohio Rules of Evidence governs the admissibility of subsequent remedial measures and provides, in its entirety:

> **When, after an injury or harm allegedly caused by an event, measures are taken which, if taken previously, would have**

> **made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.**

One of the rationales supporting this rule is that remedial measures have little or no probative value in establishing negligence because the injury may have been caused by reason of mere accident or through a plaintiff's contributory negligence. *McFarland v. Bruno Mach. Corp.* (1994), 68 Ohio St.3d 305, 308, 626 N.E.2d 659. However, "if [offered for] a purpose other than to show negligence or culpability then evidence of subsequent remedial measures, if relevant, should be admitted." *Worrell v. Norfolk & Western Railway Co.* (1994), 94 Ohio App.3d 133, 137, 640 N.E.2d 531 citing *McFarland*, 68 Ohio St.3d at 307-308.

{¶34} Initially, we acknowledge that Speedway took no action to modify the grate until 21 months after Betty's fall. In fact, Speedway's maintenance department assessed the grate immediately after the incident and determined the grate to be stable and in need of no repair. Specifically at issue in Speedway's motion to preclude evidence of subsequent remedial measures was the proffered testimony of Amber Tomsett and Gary Mohre.

{¶35} After reviewing the record before us, we agree with Betty that Evid.R. 407 is inapplicable under these circumstances to preclude the proffered

testimony. The testimony elicited from Tomsett and Mohre does not reference any subsequent remedial measure taken by Speedway. Accordingly, we conclude that it was error for the trial court to have based its ruling to exclude this evidence upon the remedial measures provisions of Evid.R. 407.

{¶36} However, upon reviewing Tomsett and Mohre's proffered testimony, we conclude that the trial court's decision to exclude this evidence was not an abuse of discretion because this testimony was not relevant to Betty's case and was, at best, cumulative to the other testimony offered by Betty at trial. See Evid.R. 401.[3]

{¶37} At all times during the trial, the relevant inquiry focused on the condition of the grate on October 14, 2007—*at the time of Betty's fall*. Both Tomsett and Mohre only had personal knowledge of the grate's condition *after* the incident. Amber Tomsett was an employee at the Cridersville Speedway from December 2007—two months after Betty's fall—to May 2008. Gary Mohre is a private investigator employed by Betty's counsel to assess the scene on June 23, 2008, and offer a lay person's opinion about the condition of the grate on that date.

{¶38} Betty maintains that Tomsett and Mohre's testimony would prove that any danger presented by the grate was not open and obvious because both

---

[3] Evid.R. 401 states, in its entirety: "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

witnesses would offer evidence that the grate moved unexpectedly when they walked across it. However, at trial Jeanne-Anne Adams, a former Speedway employee of five years, from 2002 to May 2007, testified that she personally experienced the grate move unexpectedly from underneath her feet while traversing it. Adams further stated that she had tripped over the grate three to five times during the tenure of her employment and that the grate would tilt out of the concrete casing if too much weight was unevenly distributed to one side.

**{¶39}** Alternatively, Betty also argues that Tomsett and Mohre's testimony was essential to impeach the testimony of Kimberly Hughes, the Cridersville Speedway Manager at the time of Betty's fall. Hughes testified that she did not know of any problems with the grate and had received no complaints concerning the unsafe condition of the grate. Additionally, Betty maintains that the proffered testimony of Tomsett and Mohre was essential to impeach Goodwin's testimony that the grate was stable.

**{¶40}** However, we are not persuaded by Betty's assertions. Nearly every witness who testified on behalf of Betty at trial made statements which impeached both Hughes and Goodwin on these points. This testimony included that of former Speedway employees who testified that they personally reported multiple customer complaints about the grate to Hughes prior to Betty's fall as well as

testimony from those employees and Betty's expert who contradicted Goodwin's testimony by stating that they believed that the grate was unsafe and unstable.

**{¶41}** Furthermore, at the hearing on Speedway's motion to preclude this evidence, the trial court stated its doubts on the record about the relevancy of this evidence to Betty's case. Specifically, the trial court expressed its "concern" with the potential prejudice of this evidence by "leaving the Jury with a bad impression that these people (Speedway) just don't care." (Motion Hrg, August 21, 2009, at 132). Thus, even assuming *arguendo* that the proffered testimony was relevant to show that Speedway had notice of any safety issues with the grate, it was not an abuse of discretion for the trial court to conclude that the probative value of the evidence was substantially outweighed by the danger of undue prejudice or of confusion of the issues. See Evid.R. 403(A) (providing that evidence, although relevant, "is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury").

**{¶42}** In sum, although we conclude that the trial court was in error to rely upon the subsequent remedial measures provisions of Evid.R. 407 to exclude this evidence, we find that the error was not prejudicial to Betty because the proffered testimony was not relevant to demonstrate to the jury the condition of the grate *at the time of Betty's fall*. In the alternative, even if the proffered testimony had been

relevant, it was, at best, cumulative given the other testimony elicited at trial and thus, its probative value was substantially outweighed by its prejudicial effect. Further, we note that "[u]nless an error in the exclusion of evidence has affected a party's substantial rights, such error will be deemed harmless." *Kelley v. Carins & Bros.*, Inc. (1993), 89 Ohio App.3d 598, 611, 626 N.E.2d 986. Accordingly, we cannot find that the trial court's exclusion of Tomsett's and Mohre's testimony affected Betty's substantial rights and as such we find any error in the trial court's rationale for excluding such evidence to be harmless. Therefore, Betty's first assignment of error is overruled.

### *The Fourth Assignment of Error*

{¶43} In her fourth assignment of error, Betty asserts that the trial court erred when it allowed Speedway to introduce evidence demonstrating her "propensity to fall." Specifically, Betty claims that the trial court permitted Speedway to improperly introduce evidence of an episode in 2002—five years prior to the incident at issue—wherein Betty fell at her daughter's house and broke her right hip. Betty argues that Speedway repeatedly questioned her and other witnesses about her 2002 injury in a manner which insinuated that Betty had tripped, causing her to fall. In addition, Betty maintains that the trial court improperly allowed Speedway to question Betty and Julie about the two holding

hands immediately prior to Betty's fall and inferring that it was common practice for others to give Betty additional assistance when walking.

**{¶44}** At a pre-trial hearing, the parties argued the admissibility of the evidence related to Betty's fall in 2002. Betty's counsel intended to introduce the deposition of Dr. Hartman, the physician who performed Betty's 2002 hip surgery wherein he placed a prosthesis in Betty's right hip as a result of the injuries she sustained from the fall at her daughter's home. Dr. Hartman also treated Betty for the injuries she sustained after the 2007 fall at Speedway. The trial court cautioned Betty's counsel that Speedway would be permitted to discuss any issue related to the 2002 incident that Betty's counsel placed at issue on direct examination in the deposition.

**{¶45}** In deposing Dr. Hartman, Betty's counsel asked Dr. Hartman whether the incident at Speedway had an aggravating effect on Betty's right hip—specifically whether this latest fall had reduced the projected longevity of the prosthesis placed in Betty's right hip in 2002. In response, Dr. Hartman testified to several casual factors relating to an increased amount of problems that Betty suffered with her right hip prosthesis as a result of her fall in this case. Further, Betty's counsel asked the jury for damages based on the aggravation of her prior injury that Betty's fall at Speedway caused to her right hip. Thus, Betty's 2002 fall was placed at issue by Betty's counsel and therefore, this evidence was not

solely elicited by Speedway to infer that Betty had a propensity to fall. Thus, we cannot find that the trial court abused its discretion by allowing Speedway to inquire at trial about Betty's 2002 fall.

{¶46} Betty also maintains that the trial court improperly permitted Speedway to question Betty and other witnesses about Julie and Betty holding hands immediately prior to Betty's fall. Betty argues that on cross-examination, Speedway repeatedly used the hand holding as an attempt to depict Betty as an old lady in need of support who also possessed a propensity to fall. However, when questioned on this issue, Betty testified to the contrary by stating that she and Julie hold hands as a sign of affection. This sentiment was corroborated by other witnesses who testified that prior to her fall at Speedway, Betty was an extremely active and able-bodied 80 year old and that anytime a family member held her hand it was purely out of affection rather than support.

{¶47} In reviewing the record, it is clear that the video surveillance footage—which was stipulated to by the parties and submitted as a joint exhibit— formed the basis for Speedway's line of questioning on this issue. In this footage, Betty and Julie are holding hands as they walk from the parked car to the convenience store. Notably, the footage depicts Julie and Betty holding hands up until the point where they approach the curb. At this moment, Julie releases Betty's hand to move ahead of Betty in order to open the door for her. Thus, any

inference that Betty needed support is clearly rebutted by the footage itself which demonstrates that Julie was not concerned about her mother's ability to traverse the three inch curb. Moreover, this surveillance footage was replayed repeatedly—frame by frame—throughout trial and thoroughly analyzed in front of the jury by both parties' experts. For all these reasons, Betty's fourth assignment of error is overruled.

## *The Third Assignment of Error*

{¶48} In her third assignment of error, Betty contends that the trial court's instructions to the jury were improper. Specifically, Betty maintains that the trial court erred when it included an instruction on the doctrine of open and obvious dangers and subsequently failed to give Betty's requested instruction on constructive notice to the jury.

{¶49} In general, requested instructions should be given if they are correct statements of the law applicable to the facts in the case and reasonable minds might reach the conclusion sought by the instruction. *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 591, 575 N.E.2d 828. "In reviewing a record to ascertain the presence of sufficient evidence to support the giving of a[n] * * * instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction." Id., citing *Feterle v. Huettner* (1971), 28 Ohio St.2d 54, 57 O.O.2d

213, 275 N.E.2d 340, at syllabus. In reviewing the sufficiency of jury instructions given by a trial court, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion under the facts and circumstances of the case. *State v. Wolons* (1989), 44 Ohio St.3d 64, 68, 541 N.E.2d 443. The term "abuse of discretion" implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

## *Open and Obvious Dangers*

{¶50} Betty maintains that the trial court's instruction on open and obvious dangers was prejudicial to her case. In support of this assertion, Betty argues that the trial court's instruction improperly placed the burden on her to produce evidence that the grate was not an open and obvious danger. Below are the excerpted jury instructions with which Betty takes issue.

> **An owner of property owes no duty to protect invitees who remain on the property from open and obvious dangers on the property. The open and obvious nature of the danger itself serves as a warning to the invitees. Invitees are expected to discover those dangers and to protect themselves.**
>
> **\* \* \***
>
> **Before you can find for the plaintiff, the plaintiff must prove by the greater weight of the evidence that she was injured on the premises of defendant and that her injuries were proximately caused by a an unsafe condition of the premises which was not open and obvious to an ordinary person caused**

-25-

**by the failure of the defendant, to use ordinary care; or, if the condition was not so created, that the condition was known to the defendant, and the defendant failed to use ordinary care to correct it or to provide notice of the condition.**

{¶51} The Supreme Court of Ohio summarized the case law on the open and obvious doctrine in the following manner:

**Where a danger is open and obvious, a landowner owes no duty of care to individuals lawfully on the premises. [T]he owner or occupier may reasonably expect that persons entering the premises will discover those dangers and take appropriate measures to protect themselves. Thus, when a plaintiff is injured by an open and obvious danger, summary judgment is generally appropriate because the duty of care necessary to establish negligence does not exist as a matter of law.**

*Lang v. Holly Hill Motel, Inc.*, 122 Ohio St.3d 120, 123, 2009-Ohio-2495, 909 N.E.2d 120.

{¶52} We further note, that the trial court's instruction to the jury on open and obvious dangers was given in a greater context than the excerpt above relied upon by Betty, and included the following:

**An owner of property owes no duty to protect invitees who remain on the property from open and obvious dangers on the property. The open and obvious nature of the danger itself serves as a warning to the invitees. Invitees are expected to discover those dangers and to protect themselves. However, there may by [sic] "attendant circumstances" which limit the open and obvious nature of the danger.**

**"Attendant circumstances" are factors beyond the control of the plaintiff that contribute to proximately cause the plaintiff's injury. The phrase "attendant circumstances" refers to all the facts relating to the event causing the injury, such as**

**time and place, surroundings or background of the event and any condition normally existing that would reasonably increase the normal risk of a harmful result from the event.**

**If you find that attendant circumstances are present, then the open and obvious nature of the danger does not eliminate the duty of the owner to exercise ordinary care to keep the premises in a reasonably safe condition or provide notice of any dangers which the owner has knowledge.**

**Before you can find for the plaintiff, the plaintiff must prove by the greater weight of the evidence that she was injured on the premises of defendant and that her injuries were proximately caused by a an unsafe condition of the premises which was not open and obvious to an ordinary person caused by the failure of the defendant, to use ordinary care; or, if the condition was not so created, that the condition was known to the defendant, and the defendant failed to use ordinary care to correct it or to provide notice of the condition.**

**The defendant claims that the plaintiff was negligent. To sustain such claim defendant must prove by the greater weight of the evidence, that plaintiff failed to use that care for her own safety which a reasonably cautious person would use under the same or similar circumstances.**

**In deciding whether ordinary care was used, you will consider whether either party ought to have foreseen under the circumstances that the natural and probable result of an act or failure to act would cause some injury.**

**The test for foreseeability is not whether they should have foreseen the injury precisely as it happened to the specific person. The test is whether under all the circumstances a reasonably cautious person would have anticipated that injury was likely to result to someone from the act or failure to act.**

**If either party, by the use of ordinary care, should have foreseen some injury and should not have acted, or if they did act, should have taken precautions to avoid the result, then the**

**performance of the act or the failure to take such precautions is negligence.**

{¶53} After reviewing the complete context of the trial court's instructions on the relevant issue of overall negligence and within the framework of the relevant case law, we cannot find that the trial court erred in instructing the jury as it did. Further, when viewed in complete context as to the duty of care, we find that the trial court's instructions on open and obvious dangers were substantially consistent with the relevant case law as stated by the Supreme Court of Ohio.

{¶54} Thus, based on the above, the trial court's instruction reflected the correct statement of law and the evidence at trial supported the trial court's decision to give the instruction. Therefore, we cannot say the trial court abused its discretion in giving the jury the instruction it did on open and obvious dangers.

*Constructive Notice*

{¶55} Betty also contends that the trial court erred when it refused to instruct the jury on constructive notice as stated in her proposed jury instructions. Instead, the court provided the following instruction:

> **A business owes a duty to a customer or business invitee to use ordinary care for the care for the customer's safety, to keep the premises in a reasonably safe condition, and to use ordinary care to provide notice of any concealed dangers of which the store has knowledge or which in the exercise of ordinary care should have discovered. You are instructed that Betty Warkoczeski was a customer or business invitee of Speedway SuperAmerica, LLC.**

{¶56} Initially we note that Betty fails to cite any authority supporting her assertion that the trial court's instruction is erroneous. However, after reviewing the relevant case law it is apparent that the trial court's instruction incorporated the correct statement of the law.[4]

{¶57} Based on the foregoing, the trial court did not abuse its discretion when it instructed the jury on open and obvious dangers and when it refused to include Betty's proposed jury instructions on constructive notice. As such, Betty's third assignment of error is overruled.

{¶58} For all the reasons stated above, the judgment of the Auglaize County Court of Common Pleas is affirmed.

*Judgment Affirmed*

**ROGERS and PRESTON, J.J., concur.**

**/jlr**

---

[4] A business owner owes business invitees a duty of ordinary care, which includes the duty to maintain the premises in a reasonably safe condition and to warn an invitee of latent or concealed defects of which the owner has or should have knowledge. *Perry v. Eastgreen Realty Co.* (1978), 53 Ohio St.2d 51, 52-53, 7 O.O.3d 130, 130-131, 372 N.E.2d 335, 336; *Kubiszak v. Rini's Supermarket* (1991), 77 Ohio App.3d 679, 686, 603 N.E.2d 308, 313.